IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

**Plaintiff**,

v.

AHSHA NATEEF TRIBBLE [1],
DONALD KEITH ELLISON [2],

**Defendants.**

**Criminal No.** 19-541 (FAB)

**OPINION AND ORDER**

Defendants Donald Keith Ellison ("Ellison") and Ahsha Nateef Tribble ("Tribble," and together with Ellison, the "defendants") move to change the venue of the criminal case against them. (Docket Nos. 94, 98-99.) As discussed below, the motion is **DENIED**.

**I.   Background**

Hurricane María struck Puerto Rico on September 20, 2017. (Docket No. 3 at p. 1.)  The hurricane extensively damaged Puerto Rico's electric power system.  Id. at p. 2.

Cobra Acquisitions, LLC ("Cobra") was contracted by the Puerto Rico Electric Power Authority ("PREPA") to help restore the electric power system.  Id. at pp. 7-11.  Ellison was president of Cobra between 2017 and 2019.  Id. at p. 2.

Tribble was an administrator in the Federal Emergency Management Agency ("FEMA").  Id.  Tribble had responsibility over

electric grid infrastructure recovery in Puerto Rico.  Id. at pp. 2, 5-6.

According to an indictment, Ellison provided things of value to Tribble, who used her influence to assist Cobra in obtaining favorable contracts, contractual terms, and contractual performance from PREPA.  See id. at pp. 11-39.  The things of value identified in the indictment include airfare, ground transportation, helicopter flights, hotel rooms, access to an apartment, meals, entertainment expenses, security services, and employment for another individual, Jovanda R. Patterson, also named as a defendant in the indictment.  See id. at pp. 12-14.

The indictment also identifies Tribble's acts performed in exchange for the things of value.  See id. at pp. 14-16.  The alleged acts include: pressuring PREPA executives so that they would accelerate payments to Cobra and choose Cobra over PREPA's employees and other contractors to do the infrastructure work, pressuring FEMA employees concerning reimbursement for Cobra's work, providing information to Cobra not readily accessible through other means, and causing a letter to be sent to the Puerto Rico government stating that the costs of Cobra's work were reasonable.  Id.

The indictment further lists overt acts in furtherance of the six charges against Ellison and Tribble, including dozens of

communications between Ellison and Tribble and actions taken in accordance with those communications. See id. at pp. 16-31. To conceal their actions, the indictment states, Ellison and Tribble used private e-mail accounts, personal cellular phones, and Ellison's personal and business credit cards. Id. at p. 16.

The indictment generally charged Ellison and Tribble together.[1] Id. at pp. 11-39. They were both charged with a bribery conspiracy, disaster fraud, and four counts of honest services wire fraud. Id. Ellison was also charged with two false statement counts. Id. at pp. 41-42.

After the grand jury charged the defendants, the Acting United States Attorney for the District of Puerto Rico held a press conference.[2] See Docket No. 94, Ex. D. The record is unclear about the precise date of the press conference. See id.

---

[1] Judgment has been entered against Jovanda R. Patterson, the third defendant charged in the indictment. (Docket No. 121.)

[2] The defendants attached to their motion a transcription of the press conference. (Docket No. 94, Ex. D.) It appears that at least some portions of the transcription were translated from the Spanish language. See id. There is no indication that the transcription is a certified translation. Local Rule 5(g). The government, however, does not contest the Court's consideration of the transcription. See Docket Nos. 100, 108. The Court will therefore assume, for purposes of resolving the defendants' pending motion to transfer venue, (Docket Nos. 94, 98-99,) that the parties have stipulated that the Court may consider any portions of the transcription translated from the Spanish language, Local Rule 5(g). Any other stipulations in this case concerning Local Rule 5(g) should be express.

The press conference chiefly focused on the factual assertions in the indictment of the defendants.  See id.  At one point, the Acting United States Attorney stated,

> These defendants were supposed to come to Puerto Rico to help during the recovery after the devastation suffered from Hurricane María.  Instead, they decided to take advantage of the precarious conditions of our electric power grid and engaged in a bribery and wire fraud scheme in order to enrich themselves illegally at the expense of our suffering.  The actions of these people are unfortunate, very unfortunate.  They took advantage of one of the most vulnerable moments in Puerto Rico's modern history to enrich themselves at the expense of the government.  Now they will have to face all of the consequences of their actions before Federal authorities.

Id., Ex. D at p. 3.  She also asserted,

> We suffered from the elements in the incident.  Horrible in our lives, I don't have to say anything else.  I was in the health recovery evacuation center and experienced this tragedy many times.  And we expect that these allegations, we always decide to be an example for people who believe that they can take for themselves and steal and arrange their lives.  They guess.  That's why we do this really.  It's important that you take that message.  Take it all over so that people get that . . . the message and stop breaking the law.

Id., Ex. D at p. 10.  Another person at the press conference, James Long, noted that "the physical disaster is significant here."  Id., Ex. D at p. 17.

During the press conference, the Acting United States Attorney also warned against reading too much into the allegations. She cautioned that "these 3 people are presumed innocent and it is

the Federal government's responsibility to prove they are guilty."
Id., Ex. D at p. 4.  She also explained, "[Cobra] was a company
that is obviously known and was doing the work that 2 people who
were involved and for 3 people and that they did illegal jobs isn't
going to mean that the work itself was defective work." Id., Ex. D
at p. 8.

## II. Parties' Positions

### A.   Defendants

The defendants argue that transfer of their case to
another district is necessary to ensure they receive a fair trial.
(Docket No. 94 at p. 1.)  They also argue that transferring the
case would be more convenient and in the interests of justice.
Id. at p. 22.

The defendants' principal argument focuses on the
impacts of Hurricane María and restoration efforts in Puerto Rico.
See Docket Nos. 94, 105.  The defendants believe that those impacts
on Puerto Rican jurors are sufficient to justify transfer to
another venue.   (Docket No. 105 at p. 2.)   The publicity
surrounding their case, according to the defendants, "only
exacerbates that impact."  Id.

According to the defendants, nearly all Puerto Ricans
were affected by Hurricane María and the loss of power.  (Docket
No. 94 at pp. 2, 12.)  "Puerto Rican jurors lost their homes, their

businesses, their livelihoods, and some lost family members."
(Docket No. 105 at p. 1.)

The impacts of Hurricane María and the recovery efforts,
the defendants contend, prevent Puerto Ricans from serving as
impartial jurors at their trial.

> [E]mpaneling a jury of Puerto Rican citizens here would
> be like picking a jury of Enron stockholders in the Enron
> case or Boston Marathon runners in the Boston Marathon
> bombing case. Those individuals are likely fair and
> impartial people, and they may even state during *voir
> dire* that they can be impartial. But objectively, their
> personal experiences simply impede them from being fair
> and impartial in this particular case.

(Docket No. 105 at p. 1.) The defendants argue that "it is asking
too much to expect people with a direct personal interest in the
litigation to sit as impartial jurors," including because the
government's case "is subjective and subtle and will require a
deep examination of the motive and intent of the parties." (Docket
No. 94 at pp. 2, 8.) "For those who were so tragically impacted
by this natural disaster and lived through the frustration of the
restoration effort," the defendants conclude, being impartial is
"simply an impossible undertaking." Id. at pp. 17.

The defendants try to distinguish their case from the
trial of Enron Corporation executive Jeffrey Skilling. Id. at
pp. 14-15. In Skilling v. United States, 561 U.S. 358, 384 (2010),
the defendants note, the Supreme Court explained that "jurors'

links to Enron were either nonexistent or attenuated." In contrast, the defendants emphasize, nearly all Puerto Ricans were affected by Hurricane María and the recovery efforts that followed. Id. at pp. 14–15.

Rather, the defendants contend, their case is similar to United States v. McVeigh, 918 F. Supp. 1467 (W.D. Okla. 1996). According to the defendants, "This case is more like the Oklahoma City bombing in which the court transferred the case out of the entire state of Oklahoma because of the immense pride, unity, and spirit of Oklahomans. The same is true here. The devastation from Hurricane María permeates the entire jury pool." (Docket No. 105 at p. 1.) The defendants believe that, like the Oklahomans, repeated emotional stories, grief, and efforts to overcome the event's consequences have resulted in a common belief among Puerto Ricans that the last step to recovery is participation in the trial of the defendants. Id. at pp. 1–2.

Defendants conducted a survey of persons living in Puerto Rico. Approximately 56% of respondents stated that they were negatively impacted by Hurricane María "a great deal" or "a lot," 28% said "somewhat," 12% said "a little bit," and 4% said "not at all." (Docket No. 94, Ex. A at p. 28.) Meanwhile, 61% of those surveyed were familiar with the defendants' case. Id., Ex. A at p. 12. Among those familiar with the case, roughly 73% said

the defendants were definitely or probably guilty and 27% said the defendants were not guilty or they did not know.  See id., Ex. A at p. 15.  Two-thirds of respondents familiar with the case stated that there was "a lot" or "some" evidence against the defendants, while the remainder either did not know or said there was just a little or no evidence against them.  Id., Ex. A at p. 17.  A number of respondents recalled specific details about the case.  Id., Ex. A at pp. 18–22.  The survey also revealed that three quarters of Puerto Ricans familiar with the charges against the defendants stated that there is "a lot" of anger or "some" anger in their communities towards the defendants.  Id., Ex. A at pp. 22–23.  Some made statements to the effect that the defendants' crimes were directed against Puerto Ricans in their time of need, while others felt that the defendants' actions delayed the repair of the electrical system.  Id. at pp. 23–27.

The defendants contrast the results of their study with the situation in United States v. Moreno-Morales, 815 F.2d 725 (1st Cir. 1987).  (Docket No. 94 at p. 17.)  The Moreno-Morales court suggested in *dicta* that, if a defendant in similar circumstances were to seek a change of venue, judicial fairness and due process may require it be granted.  815 F.2d at 739.  Among other factors—including extensive publicity surrounding a related trial in the Puerto Rico courts that concluded just prior to the

federal trial—the Moreno-Morales court noted that approximately
25% of the jury venire admitted that they believed defendants were
guilty, 10% believed the defendants may be innocent, and almost
100% admitted to prior knowledge of the highly publicized incident
at issue in the trial in the Puerto Rico courts. Id. at 735. By
contrast, the defendants in the present case note, 44% of Puerto
Ricans surveyed believed the defendants were definitely or
probably guilty. (Docket No. 94 at p. 17.) The defendants also
believe that "time will not subside or diminish the existing
prejudice." Id.

          The defendants conducted an identical survey of persons
living in the Southern District of Texas. See id., Ex. A. The
defendants assert that potential jurors in the Southern District
of Texas are less prejudiced against them and "not tainted by the
same concerns." Id. at p. 3.

          With respect to publicity about their case, the
defendants highlight the press conference held by the Acting United
States Attorney for the District of Puerto Rico. (Docket No. 94
at pp. 2-3, 10.) The press conference, the defendants aver, was
"widely reported" and contained "extremely strong" statements
against them. Id. at p. 2. The defendants further contend that
the Acting United States Attorney "strongly implied that they had
done something that caused or contributed to the power outages and

even deaths of Puerto Rican citizens" when she stated that the defendants exploited the misery and suffering of the Puerto Rican people.  Id.

The defendants also assert that media coverage of their case has been "extensive."  Id. at p. 8.  According to the defendants, there have been approximately 140 articles about their case.  Id.  The defendants state that the press coverage was sparked by the Acting United States Attorney's press conference. Id. at p. 19.  The defendants aver that the articles assume the defendants are guilty, "make completely untrue and inflammatory statements," "spread misinformation implying that the defendants are guilty and that their guilt contributed to the personal loss suffered by the entire population of Puerto Rico," and contain "seditious headlines that contribute to anger in the community and the assumption of [the defendants'] guilt.  Id. at pp. 8-9.  "This is far different," the defendants argue, "than the 'objective and unemotional' coverage in Skilling."  (Docket No. 105 at p. 8.) And they believe the press coverage will continue.  Id.

The defendants do not attach copies of the press coverage to their motion or provide an index of the articles.  The few citations to articles that they provide are in the Spanish language.  See Docket No. 94 at pp. 8-10.

Additionally, the defendants argue that the pool of "available" jurors is limited in Puerto Rico. (Docket No. 105 at p. 7.) The defendants note that federal law requires jurors to meet a level of proficiency in the English language. Id. (citing 28 U.S.C. § 1865(b)(2), (3)). They also note that federal law excludes minors from serving as jurors. Id. They characterize a decision of the First Circuit Court of Appeals as "stating the true number of residents who may qualify for federal jury service in Puerto Rico is much smaller than the 3 million population size." Id. (citing United States v. Benmuhar, 658 F.2d 14, 19 (1st Cir. 1981)).[3]

The defendants advise the Court to transfer their case before *voir dire*. Id. at p. 5. Waiting until *voir dire*, the defendants argue, "would be inefficient, costly, and create immeasurable delays." Id. "*Voir dire* would also not provide any

---

[3] The English language requirement reduces the number of Puerto Rico residents otherwise eligible to serve on a jury. See Jasmine B. Gonzáles-Rose, The Exclusion of Non-English-Speaking Jurors: Remedying a Century of Denial of the Sixth Amendment in the Federal Courts of Puerto Rico, 46 Harv. C.R.-C.L. L. Rev. 497, 497 (2011). The Benmuhar court, however, did not make the statement that the defendants attribute to it. The Benmuhar court assumed that the defendant identified distinctive groups and that representation of the groups was not "fair and reasonable," held that the English language requirement for jury service operates in a systematic manner, and concluded that the state interest in "having a branch of the national court system operate in the national language" is both significant and manifestly and primarily advanced by the English language requirement. 658 F.2d at 19-20. In a footnote, the Benmuhar court observed that the defendant swore that "nearly half" of jury questionnaire respondents were eliminated because of the English language requirement. Id. at 19 n.3. The Benmuhar court further noted that the defendant "explains neither the precise content nor the exact manner of operation of the English proficiency requirement." Id.

further illumination on the crucial issue to this motion—that every potential juror on the panel will have been directly impacted in some way by the Hurricane if they lived on the island in September 2017." Id. at p. 6.

Finally, the defendants also suggest that the case should be transferred for convenience and in the interests of justice. (Docket No. 94 at pp. 20-25.)  The defendants contend that "the indictment raises questions about the administration of a federal grant program, administered in Washington D.C., by non-residents of Puerto Rico, and involving contractors from other states and conduct occurring in other states." Id. at p. 20.  And the alleged offense, the defendants argue, is "against the federal program and not against the people of Puerto Rico." Id.  The defendants' witnesses and documents, they say, are located primarily in Texas. Id. at p. 23.  The defendants also note that most of the government's interviewed witnesses live outside Puerto Rico. Id.  The defendants further observe that the District of Puerto Rico's criminal docket is congested. Id. at p. 24. Additionally, the defendants note that Texas residents are familiar with hurricanes but have much less connection to Hurricane María. Id.  They point out that more direct flights go to the airports in Houston, Texas than the airport in San Juan, Puerto Rico. (Docket No. 105 at pp. 9-10.)  For those reasons, the

defendants counsel the Court to transfer the case to Southern or Northern Districts of Texas.  (Docket No. 94 at pp. 22-25.)

### B.  Government

The government opposes the defendants' request to transfer venue.  (Docket Nos. 100, 108.)

The government disputes the relevance of the defendants' primary argument.  As the government succinctly puts it, "The defendants in this case are not charged with causing Hurricane María."  (Docket No. 100 at p. 8.)  The government says that a jury pool of Puerto Ricans is not like Enron stockholders in the Enron case or Boston Marathon runners in the Boston Marathon bombing case; "[i]f factual comparisons were to be properly drawn to the Boston Marathon bombing, the present case would be like a government contract fraudulently obtained to clean up the aftermath of the bombing."  (Docket No. 108 at pp. 1-2.)

The government likewise argues that the impact of Hurricane María alone cannot serve as the reason to transfer this case.  The government points out that the defendants do not cite any case where a natural disaster led to all subsequent fraud and bribery cases being transferred.  Id. at p. 2.  The government continues,

> Followed to their logical end, the defendants' arguments
> would require the court to transfer venue of any and all
> criminal case[s] brought in relation [to] Hurricane
> María simply because residents of Puerto Rico were
> impacted by Hurricane María. On a larger scale, the
> defendants' arguments would require a conclusion that
> fraud related to the COVID-19 pandemic could not be
> fairly tried in any district.

(Docket No. 100 at p. 8.)

The government contends that a fair and impartial jury may be impaneled from Puerto Rico's population of three million people. Id. at pp. 5–6. The government posits that all adult United States citizens residing in Puerto Rico are eligible for consideration as potential jurors. Id. at p. 6 n.2.

The government suggests that the Court should ascertain the level of prejudice through *voir dire*. Id. at p. 5. According to the government, *voir dire* is preferable to public opinion surveys as a means of determining prejudice. Id. at pp. 6–7.

If the Court were to consider the defendants' public opinion survey, the government argues that it supports the notion that a fair jury may be impaneled in Puerto Rico. Id. at p. 7. The government notes that approximately 38% of those surveyed were unfamiliar with the defendants' case and 17% felt the defendants were not guilty or did not know, so a majority of those surveyed did not believe defendants were guilty. Id. The government also

Criminal No. 19-541 (FAB)                                    15

observes that a majority of those surveyed did not sense more than a little anger in their community.  Id.

The government also argues that the publicity surrounding the defendants' case has been neither extraordinary nor pervasive.  Id. at p. 8.  The government contends that the press coverage has been directly based on the allegations in the indictment or significant developments in the case.  Id. at pp. 9–11.  The government states that, to its knowledge, "no documentary evidence or witness statements outside of the descriptions contained in the indictment have been published by the press."[4] Id. at p. 9.

Additionally, the government notes the delay between media attention and trial.  Id. at pp. 12–13.  The fifteen months between the publicity associated with return of the indictment and the trial date in January 2021, the government argues, "is a substantial amount of time and more than sufficient to mitigate the potential of presumed juror prejudice."  Id.

Finally, the government argues that convenience and the interests of justice do not support transfer to a district in Texas.  Id. at pp. 13–16.  The government disputes the connection of the defendants or the case to Texas.  Id.  The government notes

---

[4] The defendants do not contest this assertion in their reply.  See Docket No. 105.

Criminal No. 19-541 (FAB)                                            16

that the case involves multiple witnesses involved in the electric

power restoration in Puerto Rico, including some who continue to

reside in Puerto Rico.  Id. at p. 15.  The government also states

that the Southern District of Texas is one of the busiest districts

in the country.  (Docket No. 108 at p. 4.)  And the government

asserts that Houston's two airports do not provide a sufficient

reason to transfer the case.  Id. at pp. 3-4.

## III. Legal Standard

### A.   Transfer Based on Prejudice

The Constitution guarantees the right to an impartial

jury in all criminal prosecutions.  U.S. Const. amend. VI.  "[T]he

right to jury trial guarantees to the criminally accused a fair

trial by a panel of impartial, 'indifferent' jurors."  Irvin v.

Dowd, 366 U.S. 717, 722 (1961).  The Constitution also guarantees

due process of law.  U.S. Const. amend. V.  "A fair trial in a

fair tribunal is a basic requirement of due process."  Irvin, 366

U.S. at 722 (internal quotation marks omitted).

Sometimes, prejudicial circumstances bring about a

presumption that those constitutional guarantees will be denied a

defendant if he is tried in a given district.[5]  Where "extraordinary

---

[5] A jury may be actually prejudiced against a defendant.  See, e.g., Skilling,
561 U.S. at 377; United States v. Misla-Aldarondo, 478 F.3d 52, 58 (1st Cir.
2007).  Actual prejudice is not at issue here; no jury has been impaneled and
jury selection has not begun.

local prejudice will prevent a fair trial," or "there is an ever-prevalent risk that the level of prejudice permeating the trial setting is so dense that a defendant cannot possibly receive an impartial trial," the courts presume that prejudice requires a district court to grant a defendant's request for transfer of a criminal trial to another district.  <u>Skilling</u>, 561 U.S. at 378; <u>United States v. Quiles-Olivo</u>, 684 F.3d 177, 182 (1st Cir. 2012).

Rule 21 of the Federal Rules of Criminal Procedure provides for the transfer of a criminal proceeding to another district in the event of prejudice against the defendant.  Fed. R. Crim. P. 21(a).  Transfer is mandatory "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."  <u>Id.</u>; <u>United States v. Walker</u>, 665 F.3d 212, 223 (1st Cir. 2011) (describing Rule 21(a) as "the mandatory transfer provision").  The defendant bears the burden of making the necessary showing.  <u>See</u> 2 Charles Alan Wright <i>et al.</i>, <u>Federal Practice & Procedure</u> § 343 (4th ed. 2020).

The courts have not decided whether there is a difference between the constitutional and rule-based requirements for transfer in the event of prejudice.  The First Circuit Court of Appeals has noted the possibility of different analysis, but assumed that the analysis is the same where the parties did not

distinguish between the two.  United States v. Casellas-Toro, 807 F.3d 380, 385 n.2 (1st Cir. 2015).  The parties here also make no distinction, and the Court assumes the analysis is the same.

The courts have also not decided whether, if a presumption of prejudice arises, the government can rebut the presumption.  The United States Supreme Court did not reach the question in Skilling.  561 U.S. at 385 n.18.  The First Circuit Court of Appeals has assumed without deciding that the presumption is rebuttable.  See Casellas-Toro, 807 F.3d at 389.

Pre-trial publicity is a predominate subject of the analysis on whether a court should presume prejudice to a defendant's fair trial rights.  "A presumption of prejudice is generally 'reserved for those extreme cases where publicity is both extensive and sensational in nature.'"  Casellas-Toro, 807 F.3d at 386 (quoting Quiles-Olivo, 684 F.3d at 182).  The mandatory transfer provision in Rule 21(a) "has been applied almost exclusively in cases in which pervasive pretrial publicity has inflamed passions in the host community past the breaking point." Walker, 665 F.3d at 223.

Jurors will often be aware of high-profile cases.  As the Supreme Court of the United States explained long ago,

> In these days of newspaper enterprise and universal
> education, every case of public interest is almost, as
> a matter of necessity, brought to the attention of all
> the intelligent people in the vicinity, and scarcely any
> one can be found among those best fitted for jurors who
> has not read or heard of it, and who has not some
> impression or some opinion in respect to its merits.

Reynolds v. United States, 98 U.S. 145, 155–56 (1878).  Criminal

cases in particular may arouse the interest of the public.  Irvin,

366 U.S. at 722–23.  "It is no surprise that people in general,

and especially the well-informed, will be aware of [a high-profile

case]."  In re Tsarnaev, 780 F.3d 14, 15 (1st Cir. 2015) (*per

curiam*).

The standard for transferring a case based on publicity-

induced prejudice is strict.  The Supreme Court has found transfer

necessary where the trial atmosphere is "utterly corrupted by press

coverage," but "[p]rominence does not necessarily produce

prejudice, and juror impartiality . . . does not require

ignorance."  Skilling, 561 U.S. at 380–81 (internal quotation marks

omitted).  "Extensive knowledge in the community of either the

crimes or the defendants is not sufficient, by itself, to render

a trial constitutionally unfair."  United States v. Drougas, 748

F.2d 8, 29 (1st Cir. 1984).  Also, "[i]f the media coverage is

factual as opposed to inflammatory or sensational, this undermines

any claim for a presumption of prejudice."  United States v.

Angiulo, 897 F.2d 1169, 1181 (1st Cir. 1990).

Another factor considered in the presumption analysis is "a more indirect measure that looks at the length to which the trial court must go in order to select jurors who appear to be impartial." Id. (internal quotation marks omitted). Courts usually consider the actual jury selection experience when evaluating this factor. See id.

A host of other considerations are sometimes relevant to the presumption analysis. These include a widespread community impact or bias from either an alleged crime or something besides the alleged crime. See United States v. Campa, 459 F.3d 1121, 1175 (11th Cir. 2006) (en banc) (Birch, J., dissenting).

Ultimately, all of the factors must be weighed to determine whether "extraordinary local prejudice will prevent a fair trial." Skilling, 561 U.S. at 378; see Murphy v. Florida, 421 U.S. 794, 799 (1975) (evaluating whether "any indications in the totality of circumstances" demonstrate "that petitioner's trial was not fundamentally fair").

The United States Supreme Court has elucidated how the constitutional analysis is affected by pre-trial publicity and matters of local interest. Two of the high court's contrasting cases provide a useful framework.

The "foundation precedent," according to the Skilling Court, 561 U.S. at 379, is Rideau v. Louisiana, 373 U.S. 723

(1963).  The defendant in <u>Rideau</u> was interrogated on film while imprisoned and surrounded by law enforcement officers.  <u>Id.</u> at 724-25.  He confessed to a robbery, kidnapping, and murder.  <u>Id.</u> A local television station broadcast the confession on three occasions to audiences ranging from 24,000 to 53,000 individuals. <u>Id.</u>  The parish where the defendant was tried had a population of 150,000 people.  <u>Id.</u>

The <u>Rideau</u> Court held the defendant's due process rights were violated at his trial.  "[T]o the tens of thousands of people who saw and heard it," the <u>Rideau</u> Court explained, the interrogation "in a very real sense was Rideau's trial—at which he pleaded guilty."  <u>Id.</u> at 726.  Following that exhibition, the actual trial amounted to just a "hollow formality" and a "kangaroo court."  <u>Id.</u>

More recently, in <u>Skilling</u>, 561 U.S. at 381-85, the Supreme Court considered whether an executive at Enron Corporation received a fair trial in Houston, Texas, where Enron was headquartered.  Many people lost their jobs and many organizations lost funding when Enron collapsed.  <u>Id.</u> at 427-28 (Sotomayor, J., concurring in part and dissenting in part).  Media attention was rampant.  <u>Id.</u> at 383-85 (majority opinion); <u>id.</u> at 427-28 (Sotomayor, J., concurring in part and dissenting in part).  The

_Skilling_ Court held the Constitution did not require a transfer. _Id._ at 385 (majority opinion).

The _Skilling_ Court highlighted four factors:  the size and characteristics of the community, the content of publicity, the length of time between reporting and the trial, and whether the jury's verdict indicates bias.  _Id._ at 382-84.  Unlike the small parish in _Rideau_, the _Skilling_ Court noted, Houston was this country's fourth-largest city with a jury-eligible population of four-and-a-half million individuals.  _Id._ at 382.  Additionally, "although news stories about [the defendant] were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  _Id._  Third, the _Skilling_ Court noted that four years elapsed between Enron's bankruptcy and the defendant's trial, and while related news stories were published throughout the period, "the decibel level of media attention diminished somewhat in the years following Enron's collapse."  _Id._ at 383.  Also, "and of prime significance," the _Skilling_ Court noted that the jury acquitted the defendant on nine counts.  _Id._  The _Skilling_ Court further explained that the "sheer number of victims" did not trigger a presumption of prejudice, and that "[a]lthough the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron, the

extensive screening questionnaire and followup *voir dire* were well
suited to that task." Id. at 384.

### B.    Transfer Based on Convenience and Interests of Justice

Rule 21 also provides that transfer is permissible for
convenience and in the interests of justice.  Fed. R. Crim.
P. 21(b).  Transfer is permissible "for the convenience of the
parties, any victim, and the witnesses, and in the interest of
justice." Id.  "Rule 21(b) links the two requirements—convenience
and the interest of justice—and when a rule lists two requirements
in the conjunctive, both must be satisfied." Walker, 665 F.3d at
224.  Relevant factors "include the location of the parties,
potential witnesses, contested events, relevant documents, and
counsel, expense to the parties, overall accessibility of the trial
location, and any other special factor." United States v. Dávila-
Bonilla, 307 F. Supp. 3d 1, 3 (D.P.R. 2018) (Besosa, J.).

## IV.  Discussion

### A.    Transfer Based on Prejudice

The defendants have failed to show that "extraordinary
local prejudice will prevent a fair trial" or that "there is an
ever-prevalent risk that the level of prejudice permeating the
trial setting is so dense that a defendant cannot possibly receive
an impartial trial." Skilling, 561 U.S. at 378; Quiles-Olivo, 684
F.3d at 182.  Therefore, no presumption of prejudice arises.

### 1.   Size and Characteristics of the Community

The parties dispute the relevant population for the Court's analysis.  The defendants contend that age and language requirements for jury service bear on the Court's resolution of the defendants' motion to transfer venue, (Docket No. 105 at p. 7,) while the government suggests that all adult United States citizens residing in Puerto Rico the relevant group, (Docket No. 100 at p. 6 n.2.)

Frankly, the courts have been less than clear on this issue.  Some opinions discuss the total population of a given area, see, e.g., Rideau, 373 U.S. at 724; Casellas-Toro, 807 F.3d at 386; Tsarnaev, 780 F.3d at 24, while others concentrate on the jury-eligible population, see, e.g., Skilling, 561 U.S. at 382.

For present purposes, the age and language requirements do not contribute to a presumption of prejudice, alone or in combination with the defendants' other arguments.  Even if the Court were to limit its consideration to the population that satisfies those requirements—a population for which the defendants provide no statistical data—the defendants do not argue or show that this smaller population is differently or extraordinarily prejudiced against them.  As a matter of fact, record suggests the contrary:  the defendants' survey of English-speaking Puerto Rico

residents found that more than half had not concluded that the defendants were guilty.  (Docket No. 94, Ex. A at p. 15.)

The defendants' principal argument concerns an asserted widespread community impact or bias stemming from something other than their alleged crimes.  They contend that the impacts of Hurricane María and the associated recovery efforts, along with Puerto Ricans' feelings about corruption, have extraordinarily prejudiced Puerto Ricans against them.  (Docket No. 94 at pp. 1–17; Docket No. 105 at pp. 1–2.)  Their prejudice arguments do not concern the impact of their alleged crimes, and the pre-trial publicity is said to "only exacerbate[]" what is already a sufficient condition for presuming prejudice.  (Docket No. 105 at p. 2.)

In support of their argument, the defendants point to McVeigh, 918 F. Supp. 1467.  (Docket No. 105 at pp. 1–2.)  In McVeigh, one judge decided to transfer the case out of Oklahoma City because "obtaining an impartial jury in Oklahoma City would be 'chancy,'" the parties did not disagree, and "[t]he effects of the explosion on that community are so profound and pervasive." 918 F. Supp. at 1470.  The McVeigh court then decided that the case had to be transferred to a district outside of Oklahoma because of publicity and the impact of the crime on Oklahomans. Id. at 1475.  The McVeigh court pointed to extensive and emotional

media attention in Oklahoma, a strong identification among Oklahomans with the victims, and a sense of obligation in the community to reach a result which would find general acceptance in the relevant audience.  Id. at 1473.

McVeigh is not analogous to this case.  The defendants' argument in McVeigh concerned the impact of their alleged crimes.  Here, the defendants focus on the impact of Hurricane María and recovery efforts, not their alleged crimes. Indeed, the defendants assert that "there is no allegation in the indictment that a single Puerto Rican citizen was harmed by the Defendants' alleged conduct." (Docket No. 105 at p. 9.) Moreover, although the defendants argue that there is a common belief among Puerto Ricans that the last step to recovery from Hurricane María is participation in the trial of the defendants, (Docket No. 105 at pp. 1-2,) they have not supported the argument.  In fact, the defendants' study reveals that a majority of Puerto Ricans were either unfamiliar with the case, sensed little-to-no anger in their community towards the defendants, or did not know how much anger there was in the community.  (Docket No. 94, Ex. A at pp. 22-23.) And, as discussed below, the defendants have not shown that the publicity in this case is inflammatory.

Other cases, not cited by the defendants, involve a transfer request based on a widespread community impact or bias

from something besides the alleged crime.  The courts in these cases generally decline to presume prejudice and decide to examine the extent of bias during *voir dire*.

One helpful case is United States v. Warren, 989 F. Supp. 2d 494 (E.D. La. 2013).  The Warren case concerned police officers' alleged involvement in the shooting and burning of a man immediately after Hurricane Katrina.   United States v. Warren, Crim. No. 10-154, 2010 WL 4007307, at *1 (E.D. La. Sep. 28, 2010).  Two defendants argued for transfer to another district relying on, among other things, "the jury pool's collective experience with Hurricane Katrina and law enforcement."  989 F. Supp. 2d at 503.  One of the two defendants argued that there was an embedded community perception, fueled by publicity, that numerous police officers engaged in lawlessness after the storm.  Id.  Another argued, "In short, Houston is bigger than Enron, which was but a blip on its history.  New Orleans is not bigger than Katrina, which now is in the fabric of New Orleans history."  Id. (internal quotation marks omitted).

The Warren court rejected the argument.  The Warren court found that "[g]eneralizing and anticipating the potential effects of [Hurricane] Katrina on the jury pool in this case would require speculation not called for by the pre-trial prejudice analysis."  Id.  "[W]hile many jurors may have experienced the

effects of Hurricane Katrina, very few of these residents were victims of unjustified force or obstruction of justice by police officers following the storm.  Hurricane Katrina itself does not suggest or undermine a presumption of prejudice." Id. (internal quotation marks omitted).

The First Circuit Court of Appeals addressed a case in which the asserted bias stemmed from something besides the alleged crime in United States v. Brandon, 17 F.3d 409 (1st Cir. 1994).  There, the defendants were tried in Rhode Island on charges associated with defrauding a financial institution.  Id. at 421. The trial came on the heels of an unrelated crisis in which credit unions were closed and hundreds of thousands of angry depositors had their assets frozen.  Id. at 441.  The unrelated crisis received extensive media coverage.  Id.

The Brandon defendants argued that public sentiment concerning the credit union crisis, as well as media coverage directly related to their charges, would prejudice the jury against them.  Id.  They provided forty-four newspaper articles related to their case and others concerning the credit union crisis.  Id.

The First Circuit Court of Appeals court rejected the argument.  "The articles presented by the defendants," the court explained, "evidence standard factual press coverage of a criminal case and are neither inflammatory nor sensational." Id.

The <u>Brandon</u> court also "f[ou]nd nothing in the record to indicate that the jurors' feelings about the credit crisis, if they had any, impaired their impartiality in the present case" and the district judge did not abuse his discretion in "determin[ing] that the jurors would understand that the credit crisis had no connection to this case." <u>Id.</u> at 441-42.

In <u>United States v. Salim</u>, 189 F. Supp. 2d 93, 94 (S.D.N.Y. 2002), the defendant was charged with, among other things, crimes associated with an embassy bombing in Africa. Publicity concerning that bombing was not sufficient to warrant a venue transfer. <u>Id.</u> at 96. The defendant was not charged with crimes associated with the events in New York on September 11, 2001, yet the question before the <u>Salim</u> court was whether "the events of September 11, 2001 ha[d] so incapacitated potential jurors drawn from the Southern District of New York that a fair trial [t]here for [the defendant] would be unlikely." <u>Id.</u> The court responded in the negative, finding that *voir dire* and an expanded jury pool would be sufficient to protect the defendant's right to a fair trial. <u>Id.</u> at 96-97.

In <u>United States v. Wheaton</u>, 463 F. Supp. 1073, 1078 (S.D.N.Y. 1978), the defendant moved for transfer on the grounds that he would be prejudiced by a trial in New York because, he said, "[i]t is a well known fact that New York City and, in

particular, Harlem, which is the part of the Southern District
[is] known notoriously as 'The Narcotics Capitol [*sic*] of the
World.'"   The Wheaton court denied the motion because the logical
conclusion of the defense theory would prohibit all narcotics
trials in New York and, indeed, federal prosecutors would be unable
to prosecute crimes in the areas where the crimes were the most
prevalent.   Id.

        An additional case dealing with community bias not
directly caused by the crime is United States v. Washington, 813
F. Supp. 269 (D. Vt. 1993).   The defendants in that case were
African-Americans from New York who were charged with drug and
firearm offenses in Vermont.   Id. at 271.   They sought a transfer
fearing an "outsiders" bias and a racist bias in predominately-
white Vermont.   Id.   The Washington court held that the defendants
had not met their burden to show the risks would deny them a fair
trial and decided that the issue would be best considered after
*voir dire*.

        The Court reaches a similar conclusion as that
reached in Warren, Brandon, Salim, Wheaton, and Washington.   The
question before the Court is whether to presume that the defendants
cannot receive a fair trial in the District of Puerto Rico.   The
fact that Puerto Ricans experienced the effects of Hurricane María
and the ensuing recovery efforts is not sufficient, at this stage

of the proceedings, to create a presumption of prejudice in this case. The Court believes that jurors will be able to separate their experiences with Hurricane María and the associated recovery efforts from the criminal allegations involved in this case. *Voir dire* will be an effective tool for identifying and rooting out prejudice or bias. Patton v. Yount, 467 U.S. 1025, 1038 & n.13 (1984); Brandon, 17 F.3d at 441-42; Salim, 189 F. Supp. 2d at 96. Moreover, the defendants' own survey revealed that almost forty percent of respondents were unfamiliar with the case against the defendants, lending credence to the notion that there is a reasonable likelihood that the Court will be able to identify twelve jurors who will not prejudge the case against the defendants.

The defendants argue that Hurricane María's effect on nearly all Puerto Ricans distinguishes their case from the Enron-related trial of Jeffrey Skilling. (Docket No. 94 at pp. 2, 12-15.) The Supreme Court's decision in Skilling actually undercuts the defendants' motion. When Enron collapsed, "[t]housands of the company's employees lost their jobs and saw their retirement savings vanish. As the effects rippled through the local economy, thousands of additional jobs disappeared, businesses shuttered, and community groups that once benefited from Enron's largesse felt the loss of millions of dollars in

contributions." 561 U.S. at 428 (Sotomayor, J., concurring in part and dissenting in part). There was a "widespread community impact." Id. at 384 (majority opinion). And yet, "Enron's sheer number of victims [did not] trigger a presumption of prejudice." Id. (citation and internal quotation marks omitted). Rather, "the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron." Id. It was during *voir dire* that it became clear that the jurors' links to Enron were "nonexistent or attenuated." Id. As in Skilling, the *voir dire* in this case will serve to identify potential jurors' connections to the defendants and their alleged crime, as well as to uncover any bias or prejudice among the potential jurors.

Nor does Moreno-Morales support the defendants' position. Granted, as defendants point out, the 44% of poll respondents who believe the defendants are guilty, (Docket No. 94, Ex. A at p. 15,) is a higher proportion than the 25% of veniremembers who responded similarly in Moreno-Morales, 815 F.2d at 735. The clear focus in Moreno-Morales, however, was the widely followed publicity surrounding the alleged criminal events, the legislative investigation, and the trial in the Puerto Rico courts that concluded shortly before the federal trial began. Id. at 734-39. The defendants have not shown any similar circumstances in this case.

The decision in <u>Casellas-Toro</u> is distinct for essentially the same reason.  The "[m]ost important[]" factor was that "the media extensively and sensationally covered Casellas's Commonwealth trial, conviction, and sentencing in a just-concluded case intertwined with this one."  807 F.3d at 387.  The defendants have failed to bring this case within the <u>Casellas-Toro</u> precedent.

### 2.    Press coverage

The defendants have failed to show that inflammatory publicity has prejudiced the community.  The argument and materials provided by the defendants are not sufficient on their own or in combination with other factors to bring about a presumption of prejudice.

The defendants provide the Court with nothing but bare allegations concerning the media's coverage of the case against them.  As noted, the defendants do not attach any examples of media coverage to their motion, and the few citations to news articles provided by the defendants are in the Spanish language.  <u>See</u> Docket No. 94 at pp. 8–10.  The Court cannot consider those Spanish-language documents.  <u>Puerto Ricans for P.R. Party v. Dalmau</u>, 544 F.3d 58, 67 (1st Cir. 2008).  And bare allegations are not enough.  <u>United States v. Rodríguez-Cardona</u>, 924 F.2d 1148, 1158 (1st Cir. 1991).

The Acting United States Attorney's press conference, meanwhile, did not create or meaningfully contribute to a presumption of prejudice. Unlike the televised confession in Rideau, 373 U.S. at 724-25, there is no indication concerning how many Puerto Ricans might even have become aware of the press conference. The substance of the press conference concentrated on the factual allegations in the indictment. See Docket No. 94, Ex. D. Such statements do not require a venue transfer. See Quiles-Olivo, 684 F.3d at 182 (discussing media coverage); Angiulo, 897 F.2d at 1181 (same); United States v. Maldonado-Medina, 761 F.2d 12, 19 (1st Cir. 1985) (same).

Perhaps, as the defendants assert, a select few of the statements at the press conference went beyond a dry factual recitation of the charges. See Docket No. 94 at pp. 2-3, 10 (quoting statements). But these statements are less prejudicial than references to a "mafia boss" and like characterizations, all of which "fall significantly short of the type of emotionally charged, inflammatory, sensationalistic coverage needed to support a presumption of prejudice." Angiulo, 897 F.2d at 1181. The statements are nothing like the "smoking-gun variety" that "invite[s] prejudgment of [a defendant's] culpability." Skilling, 561 U.S. at 383. In fact, the press conference came with explicit warnings against prejudging guilt. See Docket No. 94, Ex. D at

pp. 4, 8 (cautioning that "these 3 people are presumed innocent and it is the Federal government's responsibility to prove they are guilty" and explaining that "[Cobra] was a company that is obviously known and was doing the work that 2 people who were involved and for 3 people and that they did illegal jobs isn't going to mean that the work itself was defective work").

Finally, the delay between the trial and the press conference is substantial.  The Court has not identified the date of the press conference in the materials before it.  See Docket No. 94, Ex. D (undated transcript of press conference).  If the press conference occurred shortly after the indictment in this case was unsealed, approximately fourteen months would elapse between the press conference and the January 2021 trial date scheduled for this case.  In the circumstances of this case, that is enough time for "the decibel level of publicity about the crimes themselves to drop and community passions to diminish."  In re Tsarnaev, 780 F.3d at 22.

**B.    Transfer Based on Convenience and Interests of Justice**

The Court declines to transfer this case pursuant to Rule 21(b).  The defendants have not shown that either the convenience prong or the interests of justice prong support transfer.

The defendants do not make an explicit argument concerning the interests of justice prong of Rule 21(b). <u>See</u> Docket Nos. 94, 105. Presumably, they believe that the prejudice they fear with respect to Rule 21(a) supports a transfer in the interests of justice. For the reasons discussed above, however, the Court considers that argument unavailing at this time.

The defendants' showing with respect to the convenience prong of Rule 21(b) also does not support transfer. As the defendants recognize, the events at issue in this case occurred in many districts. <u>See</u> Docket No. 94 at p. 20. Certain events at issue occurred in Puerto Rico, (Docket No. 3,) and some witnesses continue to reside in Puerto Rico, (Docket No. 100 at p. 15.)

## V. Conclusion

For the reasons discussed above, the defendants' motion to transfer venue, (Docket Nos. 94, 98-99,) is **DENIED.**

**IT IS SO ORDERED.**

San Juan, Puerto Rico, June 26, 2020.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE